Duane *v.* Philadelphia et al.

Argued March 30, 1936. Before KEPHART, C. J., MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Clarence G. Myers,* of *Duane, Morris & Heckscher,* for plaintiff.

*Joseph Sharfsin,* City Solicitor, with him *John P. Berry, G. Coe Farrier* and *Ernest Lowengrund,* Assistant City Solicitors, for defendants.

OPINION BY MR. CHIEF JUSTICE KEPHART, May 25, 1936:

On July 8, 1929, the City of Philadelphia enacted an ordinance providing for the creation of a loan in the sum of $50,500,000, and authorized the mayor, city controller and city solicitor, or any two of them, to borrow, for the purposes mentioned in the ordinance, at such times and in such proportions of the amount authorized as they might determine. The city now proposes to issue $5,000,000 of that authorized loan. Plaintiff's bill, here on original jurisdiction, seeks to enjoin the proposed issue on the ground that it is in violation of section 8 of article IX of the Constitution in that it exceeds the debt limitation therein set forth.

The facts are as follows: The present assessed value of taxable property in the city upon which a loan may be issued is $3,618,863,241. Ten per cent of that amount, the limit of the city's possible debt at this time, is $361,-886,324. The funded debt of the city after sinking fund credits are deducted is $450,188,900, which shows a funded indebtedness exceeding the 10% debt limit by $88,302,576. Allowing all other credits and deductions authorized by law, the net funded debt of the city exceeds the 10% debt limit by an amount over $30,000,000. In 1929 when the loan of $50,500,000 was authorized, the assessed value of city property for taxable purposes was above $4,660,000,000, and the proposed issue, of which $37,800,000 has actually been issued, was then within the debt limit after deducting all credits.

Section 8 of article IX of the Constitution, which the proposed issue of $5,000,000 is supposed to violate, reads as follows: "The debt of any . . . municipality . . . shall never exceed seven per centum upon the assessed value of the taxable property therein, but the debt of

the City of Philadelphia may be increased in such amount that the total city debt of said city shall not exceed ten per centum upon the assessed value of the taxable property therein." The first case to construe this provision was *Brooke v. Phila.*, 162 Pa. 123. That was a proceeding to declare invalid a proposed loan of $6,000,000 as exceeding the constitutional limitation. It was there said ". . . that the real debt of the city is the authorized debt." This was followed in 1914, some 20 years later, by the more important decision in *McGuire v. Phila.*, 245 Pa. 287, which was heard on original jurisdiction to enjoin the city from making a loan in excess of the constitutional limitation. Therein this constitutional provision and the Act of 1874 were considered. The bill for injunction showed that 7% of the property valuation assessed was $108,000,000. The then indebtedness was $106,000,000. The city had a lawful borrowing capacity of $2,000,000. It proposed to borrow under proper procedure $8,600,000. In defending the proposed loan as constitutional it was averred, inter alia, that the city had authorized but not issued a loan of $6,750,000. This item alone, if deducted from the indebtedness, gave it ample borrowing power. The city contended that the authorized but unissued loans were not part of its debt. In its brief, the argument was made that an authorized loan which has not been acted upon cannot in any sense be said to constitute a part of the city's debt, since the money embraced in such loan is not owing until it has, in fact, been borrowed. This court held that it did constitute a part of the debt and that the loan of $8,600,000 was void under the Constitution. In the opinion of the court, Justice BROWN, afterwards Chief Justice, stated that an authorized debt must be considered as a debt within the meaning of the constitutional provision. These cases establish that bonds which have been authorized but not issued are, nevertheless, a debt, and must be so considered in municipal financing under article IX, section 8. If it is a debt at that time,

it follows that it is the assessment of the taxable property at that time which must measure its validity. It would seem that whatever may be the viewpoint on the proper construction of this provision that these cases set the matter at rest in the present contest. But it is urged that a literal or strict construction inevitably forces a different conclusion, and that the question presented by the plaintiff as to whether or not a proposed bond issue valid at the time of authorization may be enjoined because the value of the city's taxable property has since declined, would then have to be answered in the affirmative.

If the words of this provision, "the debt . . . shall never exceed" or "shall not exceed" a fixed percentage of the assessment, be given a literal interpretation, we are compelled to say that though municipal bonds are validly issued and outstanding they become void in the hands of innocent purchasers at any time the decrease in assessed value brings the total outstanding municipal indebtedness beyond the figure arrived at by applying the percentage fixed in the Constitution to the assessments. As the present debt of the City of Philadelphia exceeds that limitation by over $30,000,000 because of a decline in the assessed value of taxable property, the bonds representing this excess would be void. If this is true as to the city, over the entire State many more millions of dollars of municipal bonds would be placed in jeopardy, and the whole structure of municipal financing would be endangered.

Heretofore, validly authorized bonds have been considered binding obligations in the hands of their holders without suspicion of a possibility that a subsequent decline in assessed value might render them invalid under our Constitution. This understanding we encouraged by our decisions in the *Brooke* and *McGuire* cases and, based upon these decisions, statutes were passed which fostered such conception. Administrative officers of municipalities strengthened it by honoring outstanding

bonds without reference to a decline in assessments during the period between the authorization and the maturity of the issues. If we are now to adopt this new and needlessly strict interpretation, we would strike down a universal conception of the factors which determine the validity of municipal obligations. The bondholders, whose rights have been impinged, would probably take steps to ascertain whether there had not been an impairment of a contract and whether the operation of our constitutional provision did not collide with relevant provisions of the Federal Constitution. Contracts between an individual and a municipal corporation are impaired whenever the right to enforce them by legal process is taken away or essentially lessened. All governmental bodies are as much bound by their contracts as are individuals, and if they deprive their obligees of the right to enforce obligations it is repudiation with all the wrong and reproach which that term implies whether the repudiator be the State, a municipality or an individual. It is not difficult to imagine what might happen if the Federal Constitution was held violated to the detriment of this provision of our Constitution.

It might be urged, however, it would not be necessary to go so far since we have previous cases which decide that when a debt has validly taken form in its inception, subsequent changes cannot impair or nullify the debt when in existence: see *Addyston Pipe, etc., v. City of Corry,* 197 Pa. 41, 49; *Gable v. Altoona,* 200 Pa. 15, 21; *Scranton Elec. Co. v. Old Forge Boro.,* 309 Pa. 73, 78. Although we do not hesitate to reaffirm everything that was decided in those cases, clearly they would not avail as a check since the principles enunciated therein could be readily distinguished when sought to be applied to the instant problem. We point out, however, that if the constitutional provision be taken in a literal, absolute and realistic sense, such meaning leads to dangerous possibilities which we cannot escape.

Since it is impossible to apply a literal meaning to this constitutional provision then an interpretation of the provision is inevitable. Under such circumstances the court is at liberty to take the most feasible view; one which is in harmony with the rules of construction applicable under the conditions such as here presented and one which works the least harm, for it is doubtful if any other municipality in the State is in a similar situation. We thought we had, by adherence to these rules, settled this interpretation in the *McGuire* case, but plaintiff would now have us add to the words "never exceed seven per centum upon the assessed value of the taxable property therein . . . [and] . . . not exceed ten per centum upon the assessed value of the taxable property therein" the further clause "at the time the bonds are actually sold." The Constitution does not so read and plaintiff's interpretation does not conform to the rules of construction applicable where great hardship results. These rules prohibit the impracticable and unreasonable conclusion contended for by plaintiff and demand that it be practical and expedient: *Cooper Manufacturing Co. v. Ferguson,* 113 U. S. 137; *U. S. v. Kirby,* 74 U. S. 482, 486; *In re Griffon,* Fed. Cas. No. 5815 [Chase, 364] ; *People v. Crawley,* 274 Ill. 139; *Pub. Ser. Com. v. New York Cent. R. Co.,* 185 N. Y. S. 267; and see the opinion of Mr. Justice SCHAFFER in *Robert E. Dalzell v. John J. Kane et al., Comrs. of the County of Allegheny,* 321 Pa. 120, holding that a statute, impossible of performance as the legislature had written it, should be interpreted in a practical way.

Section 8 of article IX was intended as a curb on municipal extravagance, but it was not intended to straitjacket municipal financing, nor to disrupt and to plunge into chaos the internal management of the city's financial affairs. Under the *McGuire* case we created a restriction on borrowing by treating the entire authorization as a debt even though the bonds were not issued. Having by this method reached the debt limit there may

be no further borrowing for municipal improvements.*
The complainant urges a second deadline. He contends
that if an attempt is made to sell the bonds when the
money is needed, the municipality is further curbed be-
cause there happens to be a subsequent recession in the
appraised value of property taxable by the municipality.
This contention involves the contradiction that at one
moment and for one purpose the authorized debt is a
valid debt of the municipality and at another moment
and for another purpose is not. Such argument creates
a complete barrier to progress and in an emergency
leaves the city helpless. Vast improvements, such as
the Locust and Broad Street Subways, mentioned in the
city's paper books, would go unfinished and disinte-
grate, the money for their completion being completely
wrapped up in an interdicted sale of the bonds. It would
create an anomalous situation if we were to say that,
after the people of Philadelphia, regularly called to the
polls in November at great expense, had voted upon a
bond issue, and signified their assent to an increase of
indebtedness whose validity in all respects was then as-
sured, the following January when the assessment came
in that the proposed issue of bonds was void simply be-
cause of the casual incident of a decline in the assessed
value of the property.

The interpretation which we gave to this constitu-
tional provision in the *McGuire* and *Brooke* cases has ac-
quired a status of a rule of property as to bonds that
have been bought and sold, as to engagements entered

---

* Of course the city might, by appropriate action, as set forth in
the Act of April 3, 1923, P. L. 50, section 1, section 3 and section 8,
either cancel the authorized indebtedness and thereby release its
borrowing power from the curb of the authorized debt, or it might
divert the authorized debt to a new purpose. But while the author-
ized debt is on the city's books no new authorization may be made,
and an intervening decrease in assessment before the cancellation
could be accomplished and a new authorization set up, might with-
draw from the city the power to replace the cancelled loan.

into on the faith of it, and as to legally authorized but unissued bonds. By these decisions we erected a signpost for municipalities and all persons dealing with them. We there established a fixed date as of which to determine the validity of bonds. It is the assessed value of the property at the time of the authorization of the loan which is to be observed, and compliance with the debt limitation thus established being shown, the legal status of the loan is forever fixed. "When a rule has been deliberately adopted and declared, it ought not to be disturbed . . . by the same court, except for very urgent reasons and upon a clear manifestation of error": *1 Cooley, Constitutional Limitations,* (8th ed.), 116.

"A constitution is not to be made to mean one thing at one time and another at some subsequent time": *1 Cooley,* op. cit., supra, at 124. Having adopted the meaning that the authorized debt is as much a debt as are outstanding bonds, it is no longer open to us to adopt a new meaning, especially where it is inevitable that untold hardship will follow. The inescapable conclusion from the *McGuire* case is that the sum total of the authorized bonds immediately became part of the debt of the city, and that the framers of the Constitution understood that the debt so created was to be gauged and measured by the then existing facts and was not to be destroyed, injured or subjected to change by future conditions, but was to be considered as having a fixed status determined as of the time that it was authorized. There are decisions of other states in accord with this thought: *State ex rel. v. Gordon,* 251 Mo. 303, 310, 158 S. W. 683; *Steinbrenner v. City of St. Joseph,* 258 Mo. 318, 226 S. W. 890; *Lewis v. Brady,* 17 Idaho 251; *Herrin v. Erickson,* 90 Mont. 259, 2 P. (2d) 296.

The legislature has passed various statutes giving to the constitutional provision a construction similar to that of the prior decisions. We stated in *Montgomery v. Martin,* 294 Pa. 25, 39, that such interpretations, while not binding, are to be heeded and given judicial consider-

ation: *Moers v. City of Reading,* 21 Pa. 188, 201, 202; *Com. v. Mathues,* 210 Pa. 372, 392.

By the Act of July 24, 1913, P. L. 976, section 1, it is provided that when a city has been authorized to incur debt, it shall be proper for such city to enter into contracts and to make necessary appropriations for such contracts without awaiting the actual issue of the loan or loans so authorized, or the receipt by the city of the money to be borrowed. In the City Charter Act of June 25, 1919, P. L. 581, section 9, of article XVII, a similar provision will be found permitting contracts to be paid out of moneys based on an appropriation out of loans authorized although the same may be unissued.

Again by the Act of June 5, 1915, P. L. 846, it is provided that it shall be lawful for the corporate authorities from time to time to use any money in their general fund for any purpose for which a loan shall have been authorized, and that they shall not be required to issue any authorized bonds until it is necessary to repay to the general fund such advances. See also the Act of June 25, 1919, P. L. 581, section 6 of article XVII.

Municipalities are thus enabled to conserve their financial strength by not immediately converting into cash the authorized debt, but in holding it in abeyance until absolutely necessary for municipal purposes. By so doing there is a saving of interest pending actual necessity for the funds. The city should not be compelled to immediately convert every bond issue into cash and pay interest on it, although it may not be called upon for years to expend it. Plaintiff's contention, if sustained, would cause a premature assumption of a large interest debt which could otherwise be postponed until some future time.

If we were to adopt plaintiff's view each and every benefit in municipal financing obtained under these acts may be nullified by a decrease in assessment. Complainant would make uncertain the replacing or providing of funds under these acts since he *fixes the time the legality*

*of the debt is determined at the date the obligation is sold* and would have us say that the constitutional mandate may then preclude the sale. All municipal financing permissible under these acts would have to be discarded because of the effect upon engagements of this character of unpredictable, future fluctuations in assessments. Where a municipality seeks to take advantage of the methods of financing extended by these acts and attempts to hold unsold portions of legally authorized loans for reimbursement to the general fund or in payment of contracts, it will find itself unable to do either of these things because of the depreciation in the value of property.

The last assessed value mentioned in the Act of April 20, 1874, P. L. 65, section 2, as since amended by various acts the last of which is the Act of May 16, 1929, P. L. 1778, section 1, which is to be set forth in the certificate to be filed in court, can mean only the assessed valuation upon which the bonds were authorized. The certificate is required to set out the formalities incident to the then increase of indebtedness. This certification contains the indicia of validity. Under plaintiff's contention, no purchaser could safely buy municipal bonds unless, at the time of purchase, a financial statement of the municipality is then secured which must include all floating or other indebtedness from the time of authorization to the dates of purchase of bonds. No bonding house could safely recommend for sale any security of a municipality unless accompanied by such statement. It would no longer be the assessed value of the property less outstanding indebtedness to the time of the authorization which determines the constitutional question, but the financial statement up to the very date of purchase which would have to be considered.

These acts emphasize that the legality of a proposed bond issue within the meaning of the Constitution must be regarded as fixed and final for all purposes at the time

of its authorization and cannot be declared illegal because of circumstances which may arise thereafter.

Once the assessment is fixed and a valid authorization is made in pursuance thereof, the actual issuance of the bonds is a mere ministerial function. A loan which is legal when authorized immediately becomes integrated as part of the city's debt for all purposes, and the actual issuance of the bonds pursuant thereto is not rendered illegal by reason of the fact that at that time the assessed value has decreased.

Bill dismissed; costs to be paid by the City of Philadelphia.

Mr. Justice SCHAFFER took no part in the decision of this case.

CONCURRING OPINION BY MR. JUSTICE MAXEY:

Section 8, article IX, of the Constitution, provides that the debt of any county, city, borough, township, school district or other municipality or incorporated district, except as provided herein, and, in section 15 of this article, shall never exceed 7% upon the assessed value of the taxable property therein, but the debt of the City of Philadelphia may be increased in such amount that the total debt of said city shall not exceed 10% upon the assessed value of the taxable property therein.

*Either this section is to be interpreted literally or it is not.* If interpreted literally, it means that no matter what the *face value* of Philadelphia's indebtedness may be *at any time,* if that face value exceeds 10% of the assessed value of property therein, it is *pro tanto* void. In other words, if Philadelphia's debt at any time should be $400,000,000 and at some time thereafter the assessed value of the taxable property in Philadelphia would fall to $3,600,000,000, the creditors of the city would have to write off 10% of the amount owing them by the city.

That this section has never been by any court so literally interpreted as to reach this absurd result is undis-

puted, and that it should not be so interpreted was expressly held by this court in *Addyston Pipe and Steel Co. v. City of Corry,* 197 Pa. 41, 49, 46 A. 1035. It follows then that the section in question is not to be interpreted literally but is to be given an interpretation that is reasonable and consistent with the intent of the framers of the Constitution.

When a constitutional provision is not to be interpreted literally, it should be given a construction that will not lead to an unreasonable result. See 25 *R. C. L.,* section 256, page 1018, and *Cooper Mfg. Co. v. Ferguson et al.,* 113 U. S. 727. In *U. S. v. Kirby,* 74 U. S. 482, 486, the Supreme Court of the United States, speaking through Mr. Justice FIELD, said: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. . . . The reason of the law in such cases should prevail over its letter." The same logic applies, of course, to the interpretation of constitutions as to the interpretation of statutes. In *McCulloch v. Maryland,* 4 Wheaton 310, at 408, Chief Justice MARSHALL expressed his recognition of the rule of reason and the avoidance of absurd consequences in interpreting the Constitution, in the following language: "The exigencies of the nation may require that the treasure raised in the north should be transported to the south, *that* raised in the east conveyed to the west, or that this order should be reversed. Is that construction of the Constitution to be preferred which would render these operations difficult, hazardous, and expensive? Can we adopt that construction (unless the words imperiously require it) which would impute to the framers of that instrument, when granting these powers for the public good, the intention of impeding their exercise by withholding a choice of means?"

To hold that when the City of Philadelphia on July 8, 1929, authorized the issue of bonds in the amount of $50,500,000, the city could then have sold the entire issue

without violating the Constitution, but that when bonds of that issue in the total sum of $37,800,000 had been sold, the city could not, without violating the Constitution, later sell the balance of the authorized issue because the assessed valuation of taxable property in the city had meantime dropped from $4,664,263,490.41 to $3,618,863,241.15, would lead to an absurd result and seriously interfere with the proper administration of the city government. When in 1929 the issue of $50,-500,000 worth of bonds was authorized by the proper authorities and sanctioned by the vote of the electors the entire sum so authorized was appropriated to the various departments of the city government to which the purposes of the borrowing as set forth in the ordinance properly appertained. To deny the city the power now to issue all or any part of the balance of this authorized issue of bonds, means the serious crippling of the city's subway program and the abandonment of other worthy projects of a permanent nature, the financing of which was the purpose of authorizing the loan in question. The city solicitor in his paper book aptly points out: "In the present instance the purpose in the proposed issue of bonds is, inter alia, to finance improvements which are bound to enhance property valuation for taxation purposes, at an interest rate far below that to which the city is now required to respond for so much of the new fund as has already been placed under contract and taken the shape of warrants or mandamus executions. There is, for example, in Philadelphia, as the court may well judicially notice, a partly completed subway railway subject to deterioration and decay, upon which millions of dollars have been already expended. To complete this structure and extend the railway facilities to the southern end of Philadelphia as is proposed would inevitably add very greatly to the taxable valuation of real estate and personal estate in that section of the city, as well as serve the convenience and needs of the electors who authorized these loans by their vote. The purpose in the

present instance which induced the council and the electors to authorize this loan was to finance improvements of a permanent nature by borrowing for a period of fifty years. This obligation can now be met at a minimum interest charge. To meet at the present time or in the immediate future from current funds the liability thus authorized to be assumed, meantime paying interest at the rate of 6%, would entail an unlooked-for hardship upon the community."

According to the contrary view, a city might undertake the financing of a $50,000,000 improvement, authorize the issuing of bonds to that extent at a time when that sum would not make the city's total debt exceed 10% of the assessed valuation of taxable property in the city, and yet if the city, in order to save interest charges, issued these bonds only as the work progressed, it might find itself, if the assessed valuation of taxable property shrunk in the meantime, enjoined from further expenditures on a partially completed improvement. If that view prevailed, those who purchase Philadelphia municipal bonds from time to time would, in order to be certain that they were not buying void bonds, have to ascertain *at the precise time* they bought the bonds that the assessed valuation of the taxable property in Philadelphia was at least ten times the amount of the total city bonds outstanding plus the bonds they proposed to buy. Constitutional provisions should not be interpreted so as to lead to such unfortunate results.

For the orderly administration of municipal affairs in respect to bond issues, there must be an exact time at which the city's borrowing power is to be determined. The framers of the Constitution knew that property values fluctuate, and they obviously did not intend that the validity of the sales of *duly authorized* municipal bonds should depend on such fluctuations. If the validity of bonds is to be determined on the date they *are sold,* it follows that the city might *authorize* an issue of bonds on a date when it would be illegal to *sell* them because

of low real estate valuation, yet it could sell them as soon as the assessed valuation of the property in the city rose to a point ten times higher than the face value of these bonds plus all others sold. This would be an anomally never contemplated by the framers of the Constitution. The only practicable date on which a city's borrowing power should be measured is the date a loan is authorized. This court has heretofore held that the date of a loan's *authorization,* not the date of the marketing of the bonds, was *the vital date* in cases of this character. Nothing could be more definite than the language of Mr. Justice DEAN, speaking for this court in *Brooke v. Phila.,* 162 Pa. 123, 29 A. 387, as follows: "The real debt of the city [of Philadelphia] is the authorized debt, less the amount of the city certificates purchased and uncancelled in that [sinking] fund." This was followed in 1914, 20 years later, by the decision in *McGuire v. Phila.,* 245 Pa. 287, 91 A. 622, which was heard on original jurisdiction to enjoin the city from making a loan in excess of the constitutional limitation. There this court speaking through Mr. Justice BROWN said: "Every authorization of a municipal loan is to be regarded as exhausting pro tanto the municipality's borrowing capacity." This court's decision in that case gives support to the proposition that the time at which it shall be determined whether or not a municipality's debt exceeds the limit imposed by the Constitution is the time the debt is authorized. This, the only practical rule to apply, has been recognized in other states. The Supreme Court of Missouri in *Steinbrenner et al. v. City of St. Joseph et al.,* 285 Mo. 318, 226 S. W. 890, said: ". . . The statutes under which these bonds were being issued contemplated the property values at the time the officials were acting, and not what might be the property value at the actual sale and disposition of the bonds."

A municipal debt is "created" within the meaning of the constitutional provision under review whenever it is duly authorized. This is the only rule that is prac-

ticably adapted to the administration of municipal affairs. A rule that the validity of bonds should be measured by the assessed valuation of taxable property at the time the bonds are sold from time to time is unworkable and would lead to fiscal confusion. When the language of any part of a Constitution is clearly not to be interpreted *literally,* as I have pointed out that section 8, article IX, of our state Constitution never has been and for practicable purposes cannot be, those whose duty it is to give judicial interpretation to a constitutional provision should bear in mind what Justice STORY said of constitutions, to wit: "They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings" *(1 Story, Constitution,* section 451). In section 454 of this same treatise, Justice STORY deprecates that method of constitutional interpretation which, as he expresses it, "weighs only the force of single words, as philosophers or critics, and not whole clauses and objects, as statesmen and practical reasoners." STORY says further, section 455: ". . . A constitution of government does not, and cannot, from its nature, depend in any great degree upon mere verbal criticism, or upon the import of single words. Such criticism may not be wholly without use; it may sometimes illustrate or unfold the appropriate sense; but unless it stands well with the context and subject-matter, it must yield to the latter. While, then, we may well resort to the meaning of single words to assist our inquiries, we should never forget that it is an instrument of government we are to construe; and . . . that must be the truest exposition which best harmonizes with its design, its objects, and its general structure."

When the municipal authorities authorize an issue of bonds, the constitutionality of their act must, in order to have a rule of feasible fiscal administration, be measured by the property valuation *then existing.* No other

rule is practicable. If the valuation of property falls after the bonds are authorized that fact should no more affect their validity than it does after the bonds have all been bought and paid for. A literal interpretation of section 8, article IX, of the Constitution, could not have been intended by those who formulated it, for a literal interpretation would make all Philadelphia city debts *pro tanto* invalid if their sum total exceeded 10% of the assessed value of the taxable property in Philadelphia. Such an absurd result of a literal interpretation calls for the rejection of it, as this court did reject it thirty-six years ago in *Addyston Pipe and Steel Co. v. City of Corry* (supra). The same rule of reasonable constitutional construction calls for the rejection of the literal but, in my judgment, *impracticable* interpretation contended for by the plaintiff in this case.

DISSENTING OPINION BY MR. JUSTICE DREW:

The fundamental premise upon which the reasoning and conclusion of the majority rest is that the authorization of a municipal loan ipso facto creates a debt of the city, and thereby increases the city's indebtedness to the extent of the amount authorized. In my opinion that proposition is unsound. In any ordinary and natural sense of the word a debt is an obligation on A's part to pay a fixed sum to B. There is no debt where there is no creditor. That such is not only the lexicographer's meaning but also the legal meaning[1] of the term is very clear from our cases, where it has been pointed out that a municipal debt is incurred when the municipality becomes

---

[1] "An indebtedness [of a municipality] cannot arise unless there is a legal, equitable, or moral obligation to pay a sum of money to another who occupies the position of creditor and who has a legal or moral right to call upon or constrain the debtor to pay": *19 R. C. L.* 276. "The term 'indebtedness' may be said to include obligations of every character whereby a municipality agrees or is bound to pay a sum of money to another": *Dillon. Municipal Corporations,* (5th ed.), section 193.

obligated to pay a certain amount to a person or entity other than itself: see *City of Erie's App.*, 91 Pa. 398, 402; *Brooke v. Phila.*, 162 Pa. 123, 128; *McGuire v. Phila. (No. 1)*, 245 Pa. 287, 292. Courts should not juggle with words or stretch their meaning beyond recognition in order to reach desired results. The majority urge that the application in this case of the usual and literal sense of the term would create "a complete barrier to progress and in an emergency [leave] the city helpless," while "vast improvements . . . would go unfinished and disintegrate." But so-called emergencies, and the furtherance of what a short-lived city administration may conceive to be progress, can furnish no justification for such distortion of the language and the spirit of the law as the majority would here employ. Laws exist for the purpose of restraining those departures from the paths of common sense and reason which inevitably occur in times of crisis and hardship. Emergencies make bad law, and decisions which are founded on temporary expediency and on the impulsion of a crisis remain when the need for them has passed and when returning reason is forced to counteract their unmeasured and untimely effects.

It is said by the majority that plaintiff's contention "involves the contradiction that at one moment and for one purpose the authorized debt is a valid debt of the municipality and at another moment and for another purpose is not." But the majority are entangled in the very same contradiction when they talk of the city's power to cancel the authorization of a loan. If the authorization is a debt, then a city is unique among debtors in being able to cancel its debt of its own motion and whenever it so desires. If the authorization of a loan constitutes a debt in the case of a municipal corporation, why is it not likewise a debt in the case of other corporations or of individuals? Why is not a principal immediately eligible to be declared insolvent and placed in receivership when he authorizes his agent to obligate

him to an amount in excess of the fair value of his assets? The mere statement of conclusions such as these suffices to show the unsoundness of the premise from which they flow.

The majority say that section 8, of article IX, was "not intended to strait-jacket municipal financing, nor to disrupt and to plunge into chaos the internal management of the city's financial affairs." In my opinion their conclusion will have just that result. It has been the general rule—and, in the absence of a contrary decision of an appellate court of this State, municipal officers may justifiably have relied on it—that an issue of bonds which is within the legal limit at the time of issuance is not made void by a prior authorization given at a time when the amount authorized would have exceeded the then existing limit.[2] But under the ruling of the majority the validity of a loan is irrevocably determined as of the time of its authorization, and if a subsequent change in conditions cannot nullify a valid authorization, neither can such a change validate a loan rendered invalid because in excess of the debt limit at the time of authorization. A city may therefore be forbidden to issue bonds which are well within its debt limit at the time of issuance simply because, at some prior time,

---

[2] See *Thompson Houston Elec. Co. v. Newton,* 42 Fed. 723; *Dudley v. Lake County Commrs.,* 80 Fed. 672, 677; *Rathbone v. Board of Commrs.,* 83 Fed. 125, 132; *Board of Education of Huron v. Nat. Life Ins. Co.,* 94 Fed. 324; *Lake County Board v. Sutliff,* 97 Fed. 270, 281; *Corning v. Board of Commrs. of Meade County,* 102 Fed. 57; *Clark v. Los Angeles,* 160 Cal. 30; *Frost v. Central City,* 134 Ky. 434; *Kirby v. Monroe,* 214 Mich. 615; *Crayton v. Charlotte,* 175 N. C. 17; *Cohen v. Houston,* 176 S. W. (Tex. Civ. App.) 809; *Dillon, Municipal Corporations,* (5th ed.), section 207; *44 Corpus Juris* 1188, 1209. In the latter authority it is said, at page 1188: "Whether a limitation of bonded indebtedness is exceeded by a particular issue of bonds must be determined as of the time of the actual issuance of the bonds, and not as of a prior date when the bonds are authorized by popular vote."

when the loan was authorized, the amount thereof was not within the then existing debt limit.

The majority attempt to find support in the *Brooke* and *McGuire* cases. But neither of those cases supports their position. An examination of the facts in the *Brooke* case—not stated or otherwise indicated in the majority opinion—makes it obvious that it has not the slightest bearing on the present situation. The holding there was that, in ascertaining the city's total indebtedness, the amount of certificates of the city's funded debt, held in the city sinking fund, was a proper item for deduction. That problem is not involved here, and the question of the status of authorized but unissued loans was in no way presented in that case. The majority's reliance is placed on a statement on page 135, to the effect that "the real debt of the city is the authorized debt, less the amount of the city certificates purchased and uncanceled in [the sinking] fund." What is meant by the word "authorized" in this statement does not clearly appear. In any event, its use in that connection is manifestly of no particular significance to the present case, since the opinion contains no discussion or intimation concerning the effect of the authorization of loans.

In support of their position that the proposed loan acquired a fixed status of validity when authorized and that the constitutional measure is not to be applied thereafter, the majority place principal reliance upon the *McGuire* case. There the city, in computing its gross indebtedness for the purpose of determining its borrowing capacity, sought to deduct the amount of certain authorized but unissued loans. In refusing to permit such deduction, this court said, at pages 297-298: "If the city's contention as to this should prevail, it would mean that a municipality's indebtedness may be authorized by the corporate authorities and electors to an unlimited amount and that the Constitution permits the authorization of that which it at the same time declares shall not be consummated. This is trifling with

the spirit and intent of that instrument, conflicts with common sense in construing it and is in the teeth of the third section of the Act of 1874, which provides that 'the indebtedness of any county, city, borough, township, school district, or other municipality or incorporated district, in this Commonwealth, may be authorized to be increased to an amount exceeding two per centum, and not exceeding seven per centum, upon the last preceding assessed valuation of the taxable property therein.' The authorization of indebtedness by a municipality is thus clearly limited by the statute to seven per centum of the assessed valuation of taxable property. In the second section of the same act the municipal authorities are permitted 'to authorize' an increase of debt to the constitutional limit. Every authorization of a municipal loan is, therefore, to be regarded as exhausting pro tanto the municipality's borrowing capacity. It is not conceivable that the framers of the Constitution, or the people who adopted it, ever intended that an election should be held to authorize that which it may be impossible to carry out; yet this is the anomalous situation contended for by the defendants." It was thus held that the restriction applied to authorized but unissued loans. The court was, of course, confronted with the Act of April 20, 1874, P. L. 65, section 3, of which restricts the *authorization* of a municipality's indebtedness to an amount not exceeding the constitutional limit. Under the terms of the act, the constitutional limit applied to the authorization of loans, and each authorization was therefore to be considered a depletion of the municipality's borrowing capacity to the extent of the amount authorized. With that act before it, the court might very well have rested its decision in the *McGuire* case on that ground alone. In any case, however, it seems quite clear to me that, in suggesting that the Constitution itself required the same result, it was not intended to imply that the limitation on authorization relieved the issuance of bonds thereunder of a like limitation. Certainly the

judges who decided that case would have held the issuance of bonds not so relieved, and would very emphatically have rejected the contention that the *McGuire* case barred that conclusion. The fact that a city must abide by the restriction in authorizing loans does not acquit it of its constitutional obligation in consummating the process thus begun. While it may be true that the authorization is the initial step in the incurring of indebtedness, it certainly cannot be denied, in my opinion, that the debt is not in fact incurred until an obligation issues and the city becomes bound to pay an ascertained creditor. How then can the city say that, while subject to the constitutional inhibition in the early stage, it is released therefrom before the culmination? If at any time before the debt is in fact incurred it appears that the limitation will be exceeded, it is the duty of the proper court, when its aid is sought, to interfere and prevent transgression of the fundamental law.

It is claimed that a literal interpretation of the term "debt" and of the constitutional provision limiting indebtedness would compel the conclusion that bonds validly issued and in the hands of innocent purchasers become void whenever a decrease in assessed value brings the total municipal indebtedness beyond the figure representing the city's debt limit. I do not see how such a supposition could be seriously entertained for a moment. Do the majority suppose that, before the decisions in the *Brooke* and *McGuire* cases,[3] which they say establish the

---

[3] In *Redding v. Esplen Boro.*, 207 Pa. 248, it was held that where a contract for the construction of a sewer was entered into by the borough at a time when the amount thereof, together with the amount of bonds previously authorized but not yet issued, exceeded the constitutional limit upon the borough's indebtedness, the contract did not involve an increase of debt beyond the constitutional limit, and the contractors were entitled to be paid. It was there said, at page 251: "When does the liability of the borough in this case for the bonds authorized by the ordinances, numbered 63 and 64, attach? Is the indebtedness incurred by the borough when the

rule, outstanding bonds were thus endangered by a decline in assessments? Do they imagine that such a situation obtains in those jurisdictions which, as indicated above, follow a contrary rule?[4] If so, it would mean that, under that rule, no municipal bond could be safely bought at any time, for neither a valid authorization nor a valid issuance would save it from the danger. The majority say that since the present debt of Philadelphia exceeds the constitutional limitation by over $30,000,000, "the bonds representing this excess would be void," un-

---

ordinances were passed on July 19, 1900, or is the indebtedness only created when the bonds were issued, October 23, 1900? If the liability was created when the ordinances were passed, then the amount of the bonds authorized to be issued constituted an indebtedness equal to about two per cent of the assessed valuation of the property of the borough, and any claim or liability for the cost of the construction of the sewer added thereto would exceed the constitutional limit of indebtedness. But was the indebtedness created by the passage of the ordinances? If, as stated in *O'Malley v. Olyphant Boro.*, supra, neither the ordinances nor the contract imposed absolute liability on the borough for the expense of the sewer, how can it be said that any liability is imposed upon the borough by the ordinance alone authorizing the issue of bonds? It may be that the bonds will never be issued, or that only a portion of them will be issued. . . . If the indebtedness was created by the passage of the ordinance, and delay for any reason should occur before the bonds should be issued, the municipality would be utterly helpless to, in the meantime, construct any improvements or incur any indebtedness whatever. Surely it could not be contemplated that all work must stop until the bonds authorized by the ordinance are actually issued. . . . It would be a harsh construction that would make the ordinance itself alone an indebtedness to defeat the claim of the contractors for the construction of the sewer who have in good faith performed their contract."

It should be noted that the holding of the majority in the present case, if applied to the facts in the *Redding* case, would make necessary the harsh result there deplored and rejected.

[4] In *Gibson v. Knapp*, 21 Misc. (N. Y.) 499, it was held that the fact that municipal bonds previously issued are at the time of suit in excess of the limit of city indebtedness does not render them void, the test being whether they were valid when sold by the city.

der the contrary rule. What bonds represent this excess? How could it be determined which bonds were to be declared void? All of them, it may be assumed, were issued and purchased before the decline in assessments, and all are in the same situation. No such result as the majority claim could ever have been supposed to follow from a holding so widely followed as is the rule that the validity of municipal bonds is to be determined as of the time of issuance. If the majority say that the result follows not from that rule but from the rule that the amount to be issued must be within the debt limit both at the time of authorization and at the time of issuance, then it seems plain to me they overlook a clear distinction. Bonds are not to be voided in the hands of innocent purchasers as a result of a change in conditions after their purchase, for the obvious reason that the rights of innocent purchasers may not be thus prejudiced. When the bond is purchased a contract is formed between the city and the purchaser, consideration has passed to the city, and its obligation given in exchange cannot be impaired by a subsequent change of conditions. No such contract exists before the actual issuance of the bonds, however, and the rights of innocent purchasers are not then involved, no matter how many times the issuance has been authorized. The reasons which prevent the invalidation of bonds by a decline in assessments after purchase therefore do not apply where the decline occurs before the bonds have been issued although after their authorization.

To suggest, as the majority opinion does, at least inferentially, that administrative officers of municipalities have heretofore disregarded the possibility of a decline in assessments after the valid authorization of a loan is to take judicial notice of facts which are not at all matters of common knowledge and which would indeed be difficult to determine. I must confess to grave doubt that municipal officials have uniformly been so careless as to neglect to reëxamine the assessments before the

issuance of bonds when there has been a substantial lapse of time and a notable decline in real estate values since the authorization. Of course if the majority mean that municipal officers have honored outstanding bonds without searching for a decline in assessments after the issuance thereof, there is no cause to dispute the statement.

The purpose of the constitutional restriction was to prevent extravagant spending by municipalities on the strength of unlimited borrowing power. As was aptly said by Mr. Justice MITCHELL in *Keller v. Scranton*, 200 Pa. 130, at page 135, "The constitutional provision is intended as a restraint on . . . spendthrift tendency, to curb the extravagance of municipal expenditure on credit, to prevent municipalities from loading the future with obligations to pay for things the present desires but cannot justly afford, and in short to establish the principle that beyond the defined limits they must pay as they go." To allow a city to issue bonds in excess of the limitation on the ground that the proposed loan did not exceed the limit at the time of its authorization is to defeat the purpose of the limitation in the most obvious sort of way. The Constitution should not be thus lightly set at naught for the sake of expediency and of temporary advantage.

It is very plain that the issuance of these bonds will obligate the city to pay the face value thereof to the holders, and that no such obligation exists prior to their issuance. Such issuance will, therefore, in my opinion increase the obligations and consequently the indebtedness of the city. Since its total debt is already in excess of the constitutional limit, the proposed issue should be declared invalid. For these reasons I would grant the relief sought.

Mr. Justice LINN joins in this opinion.