## City of Philadelphia Petition

*Robert M. Landis*, first deputy city solicitor, for City of Philadelphia.

HAGAN, J., February 5, 1953.—On January 29, 1953, this court, after a hearing upon a petition filed by the City of Philadelphia under the Act of May 21, 1921, P. L. 1054, 53 PS §§ 6757 et seq., made certain findings, and on the basis thereof entered an order in accordance with the prayer of the petition.

Because of the importance of these proceedings (involving, as they do, an existing and proposed indebted-

ness of $26,000,000, invested or about to be invested in the Philadelphia Gas Works) ; and because of the circumstance that there was presented to the court for determination questions of law relating to basic and fundamental procedure under the Act of 1921 which have never been raised or determined in any of the prior proceedings by the city under the act, the court deems it appropriate to file this memorandum opinion in support of the order heretofore entered.

On December 5, 1952, the city filed its petition under the above act for the purpose of obtaining a judicial decree excluding from the city's general indebtedness a total of $26,000,000 existing and proposed indebtedness invested or about to be invested in the Philadelphia Gas Works, as authorized by ordinances passed by city council on June 7, 1951, and October 9, 1952.

The Act of 1921 implements section 8 of article IX of the Constitution of Pennsylvania, which created for Philadelphia a special class of indebtedness to be invested in self-sustaining public improvements that might be incurred without regard to the limitation on the city's borrowing power. This section of the Constitution provides that where the City of Philadelphia has invested part of its indebtedness in a public improvement or utility which may reasonably be expected to produce revenues to the city in excess of operating expenses sufficient to pay the interest and sinking fund charges on such indebtedness, that part of the city's debt may be excluded from the calculation of its general indebtedness in determining the city's borrowing capacity. The Act of 1921 prescribes the method by which this is accomplished.

On December 29, 1952, a hearing was held on the petition of the city, at which testimony in support of the petition was submitted by petitioner. No one appeared in opposition to the petition.

Under the petition and the evidence submitted in support thereof, three issues arose for adjudication by the

court, to wit: (1) whether or not the Philadelphia Gas Works may reasonably be expected to produce revenue in excess of operating expenses sufficient to pay the interest and sinking fund charges on the indebtedness incurred or about to be incurred by the city in the gas works; (2) if the court should determine that the Philadelphia Gas Works Company may reasonably be expected to produce revenue in excess of operating expenses sufficient to pay the interest and sinking fund charges on the indebtedness, should such indebtedness be merely *deducted* or completely *excluded* from the general indebtedness of the city in ascertaining its constitutional borrowing capacity, and (3) if the court should (a) find that the Philadelphia Gas Works Company may reasonably be expected to produce revenue in excess of operating expenses sufficient to pay the interest and sinking fund charges on the city's indebtedness, and (b) conclude that such indebtedness should be completely excluded from the general indebtedness of the city in ascertaining its constitutional borrowing capacity, is the city required in these proceedings to present to the court all of its self-liquidating improvements and utilities and demonstrate that they are still self-sustaining. These issues will be considered in the order in which they are set forth above.

I. *Is the existing and proposed indebtedness of the city in the gas works self-liquidating?*—The city's petition in this case involves only part of the indebtedness which has been or will be invested in the Philadelphia Gas Works. The gas works is a municipally owned utility whose history dates back over 100 years ago when it was first created by an ordinance of city council.[1] For a good part of its much litigated existence, the Philadelphia Gas Works has been operated

---

1. For an interesting discussion of the history of the Gas Works see Philadelphia's Gas Problem, published by the Bureau of Municipal Research.

under lease arrangements by a utility company. It is presently leased to the Philadelphia Gas Works Company under an agreement dated October 5, 1938, most recently revised as of September 25, 1951, which will run until December 31, 1962, unless earlier terminated by the city because of default by the company in the substantial performance of the conditions in the agreement. After that date, the agreement is terminable at two-year intervals by either party upon specified notice to the other.

The existing and proposed gas works indebtedness with which this petition is concerned amount to $26,-000,000. Fourteen million dollars of this indebtedness was authorized by the Ordinance of June 7, 1951, ratified by the voters on July 24, 1951, as a 15-year serial loan. On October 16, 1951, $7,500,000 of bonds were issued under this ordinance and are now presently outstanding. According to the evidence presented by the city, the balance of this loan authorization, $6,500,-000 of bonds, is to be issued on April 1, 1953. Twelve million dollars of indebtedness was provisionally authorized by the Ordinance of October 9, 1952, ratified by the voters on November 4, 1952, contingent upon the exclusion decree which is sought in this proceeding. This is also a 15-year serial loan, half of which is to be issued on April 1, 1954, and the balance on April 1, 1955, so that none of the bonds contingently authorized by this ordinance has yet been issued.

By Ordinance of December 6, 1951, the entire sum of $14,000,000 was appropriated by the council for gas works purposes, and subsequently a contract was entered into by the city and the gas company, in which the gas company undertook to make capital improvements up to the amount of the loan to the gas works facilities. In the Capital Budget Ordinance for 1953, approved December 9, 1953, $12,000,000 was appropriated to the gas commission for improvements to the

gas works. A capital improvement program similar to the one undertaken under the 1951 gas works loan is contemplated for the 1952 gas works loan as soon as the court has filed its decree in this case, making the loan authorization effective.[2]

At the time of the proceeding, there was also outstanding gas works indebtedness in the amount of $7,500,000 that was authorized by Ordinance of September 12, 1947. This 30-year term loan had been made the subject of an earlier proceeding under the Act of 1921, together with the city's other self-sustaining utility indebtedness, and was excluded from the city's general indebtedness by an order of Court of Common Pleas No. 5 entered on May 7, 1951. See City of Philadelphia Petition, 76 D. & C. 156. Since that indebtedness has already been wholly excluded in determining the city's borrowing power, it was not covered by the city's petition in this case and was referred to only collaterally in order to show the exact status of the entire gas works indebtedness.

The city put in evidence a series of elaborate exhibits showing a six-year projection from 1951 to 1956, inclusive, of the annual receipts and costs of the gas works, the status of its indebtedness during the period, and the annual amount and rate of interest and sinking fund charges, both actual and estimated for the entire period. Ths basic lease agreement of the gas works between the city and the gas works company and the subsidiary debt costs agreements covering each of the two loans involved in the proceeding were also

---

2. Through the workings of the consolidated loan fund, it is possible for the city to make capital expenditures for authorized loan purposes by making advances from the general fund, and postponing the actual issuance of bonds under such loan authorizations until it is necesary to replenish the general fund in the amount of such advances: Act of June 25, 1919, P. L. 581, art. XVII, sec. 6, 53 PS §3276. Thus, the appropriations can legally be made more than a year in advance of the actual sale of the bonds.

introduced in evidence. Under the lease agreement, the city receives a base annual rental of $4,200,000 each year, with an additional rental of $1,000,000 that will be paid annually through the year 1953, at which time the latter amount may be reopened to negotiation if the city so agrees. The company also pays the city a flat annual fee of $15,000 for services rendered by the city in testing meters and gas. Since the entire facility is under lease to the gas company, the city incurs no operating costs, although these items of return are offset by the sum, slightly in excess of $3,000, which is the annual salary paid the city employe who does the meter and gas testing work for the gas company.[3]

The basic operating agreement has been supplemented by special agreements between the city and the gas company which provide full reimbursement to the city for all of the interest and sinking fund charges incurred on loans that have been authorized for gas works purposes. The city introduced in evidence an agreement dated September 7, 1951, covering the $14,-000,000 serial loan of that year, which provides for semi-annual payments by the company of sums equal to the city's interest payments in advance of such payments and for annual principal payments to cover each series of the issue as it matures.[4]

The city and the company entered into a virtually identical agreement on December 22, 1952, providing reimbursement to the city for all of the debt charges on the $12,000,000 loan authorization of October 9, 1952. The object of these agreements, as recited in

---

3. While not strictly an operating expense, this item was introduced by the city to give an accurate picture of the actual net return to the city on its gas works investment.

4. A similar agreement exists for the loan authorized in 1947, but this agreement provides for a flat annual payment of $375,000, which more than covers the actual debt costs on that loan.

the Ordinance of December 9, 1952, which authorized the mayor to execute the 1952 agreement, is to assure the self-sustaining quality of gas works indebtedness by providing that all of the debt charges will be payable out of gas revenues.

Under the Act of 1921 the court must find that the utility or public improvement whose indebtedness is sought to be excluded from the city's general indebtedness "may reasonably be expected to yield" revenues in excess of operating costs sufficient to pay the interest and sinking fund charges on the indebtedness. This is essentially the standard that is recognized by the courts in determining whether a utility is self-sustaining in other circumstances: Kelley v. Earle et al., 325 Pa. 337, 345 (1937); Williams v. Samuel et al., 332 Pa. 265, 271 (1938); Greenhalgh v. Woolworth et al., 361 Pa. 543, 552 (1949). By the standard of the Act of 1921, it is clear beyond any question that the city's indebtedness invested or about to be invested in the gas works is self-sustaining because the net revenues received by the city from its operation are substantially in excess of the interest and sinking fund charges on the debt.

The city's six-year projection of costs and revenue data in the tables introduced into evidence show that in each of the years 1952 through 1956 the city's net return from the gas works after deduction of all costs will be in the neighborhood of $5,250,000. Section 8 of article IX of the Constitution does not provide any specific test period to determine the productivity of a self-sustaining utility, as does section 15 of article IX for other municipalities. Section 15, which has been implemented by the Municipal Borrowing Law of June 25, 1941, P. L. 159, sec. 601 53 PS §2011.601, accepts a five-year performance history as a satisfactory test of a self-sustaining public improvement. By analogy, therefore, the city's evidence here of a six-year projection is ample to sustain a finding that the gas works

may reasonably be expected to yield a return to the city which will more than pay for the interest and sinking fund charges on all of the gas works indebtedness, present and prospective.

The result is in no way affected by the fact that the agreement with the gas works company is terminable by the city upon default by the company in substantial performance of its conditions, or terminable by either party after December 31, 1962, upon specified notice. Even though the gas works should no longer be operated by the gas works company and for that reason the debt costs agreements should be terminated, the court would still be justified in finding that this utility is self-sustaining.

Section 5-901 of the Home Rule Charter imposes upon the department of public property, which is charged with the responsibility of operating the city's gas facilities when they are not under lease to a private operator, the duty of maintaining gas rates at such a level "as to yield to the city at least an amount equal to operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred" for such purposes. This is the same standard as provided in the Act of 1921. Since it must be presumed that the public official charged with this legal duty will perform it, it is clear that in the event that the operation of the gas works should revert to the city, the operatng costs and the interest and sinking fund charges on its indebtedness will continue to be provided out of gas revenues, which will satisfy the requirements of the Act of 1921.

The court finds, therefore, as more particularly set forth in the formal findings which have heretofore been filed, that the Philadelphia Gas Works may reasonably be expected to yield revenue in excess of operating expenses sufficient to pay the interest and sinking fund

charges on the city's indebtedness and proposed indebtedness incurred for such purposes.

II. *Should the existing and proposed indebtedness of the city in the gas works be merely deducted or completely excluded from the general indebtedness of the city in ascertaining its constitutional borrowing capacity?*—This question goes to the basic philosophy of the Act of 1921, and involves a determination of whether the act establishes a principle for the *exclusion* of indebtedness invested in self-sustaining improvements or utilities, or only for the *deduction* of such indebtedness. The issue arises here because at the time the $12,000,000 loan authorization was submitted to the voters on November 4, 1952, the city had already reached the constitutional limit of its borrowing capacity. If the Act of 1921 provides only for the deduction of indebtedness otherwise constitutionally incurred, this proceeding would be of no avail to validate the $12,000,000 loan, for the city had no borrowing capacity at all in November 1952. If, on the other hand, the exclusion principle applies, this indebtedness could be incurred regardless of general borrowing capacity.

This question can no longer be regarded as open. The Supreme Court adopted the exclusion principle under the Act of 1921 in Atkins v. Philadelphia et al., 339 Pa. 345 (1940), in a per curiam decision affirming an opinion by Judge Flood of the Court of Common Pleas No. 6. That was a suit to restrain the sale of an $18,000,000 water bond issue. At the time the loan ordinance was passed, the city's net debt exceeded its constitutional borrowing capacity. The city had filed a petition under the Act of 1921 to exclude the existing indebtedness invested in the water system as well as the indebtedness proposed to be incurred by the bond issue. After the court entered its decree directing the exclusion of the existing and proposed indebtedness,

the mayor approved the loan ordinance and it was subsequently ratified by the voters.  In attempting to enjoin the issuance of bonds under this ordinance, plaintiff contended, among other things, that the proposed increase in the city's debt violated the constitutional debt limitation.

This contention was firmly rejected by Judge Flood, and this aspect of his opinion was affirmed by the Supreme Court.  He said (339 Pa. at 350) :

"The proper construction of Article IX, sec. 8, we believe, is that suggested by the defendants.  Their theory is that the municipal debt can be divided into two categories, a general or ordinary indebtedness and an indebtedness arising from investments in revenue producing improvements.  Only the first of these is affected by the debt limitations of the Constitution.  New loans for investment in self-sustaining utilities, on the other hand, may be floated whether or not the city has any general borrowing capacity."

We therefore follow the mandate of the Supreme Court in the Atkins case and accept the exclusion principle as basic to the Act of 1921.  We hold that the $14,000,000 gas loan, authorized at a time when the city had borrowing capacity but not made subject to a proceeding under the act until the city had none, and the $12,000,000 proposed loan, adopted and ratified when the city's net debt exceeded its constitutional limit, may be excluded from the city's general indebtedness in calculating its borrowing capacity.

III. *In these proceedings is the city required to present to the court all of its self-liquidating improvements or utilities and demonstrate that they are still self-sustaining?*—The determination of this question involves a consideration of fundamental procedure under the Act of 1921, and presents an issue which has never been raised in any of the prior proceedings under the act.  The issue is whether the city, in seeking exclusion

of the indebtedness of a single self-liquidating improvement or utility, is obliged to present to the court all of its self-liquidating projects and demonstrate that they are still self-sustaining. The difference in procedure lies between what has been aptly characterized by counsel as the "single-shot approach" and the "basket approach". Under the "single-shot approach", the city may single out for separate consideration by the court any self-sustaining improvement or utility whose indebtedness is sought to be excluded from the general indebtedness of the city in ascertaining its constitutional borrowing capacity, without the necessity of presenting for review all of the city's other self-sustaining improvements or utilities and demonstrating that they are still self-sustaining. Under the "basket approach", the city cannot single out for separate consideration one of the self-sustaining utilities, but must present to the court for review all of its self-sustaining projects and demonstrate that they are still self-liquidating.

The petition of the city under consideration is based upon the "single-shot approach"; and, although no one appeared at the hearing on the petition in opposition to the prayer of the petition, Robert M. Landis, Esq., first deputy city solicitor, appeared in these proceedings as counsel for the city and submitted to the court a comprehensive and carefully prepared memorandum in which he presents not only the arguments on which the city relies in support of the "single-shot approach", but he takes great pains to present to the court the arguments that might be advanced in support of the "basket approach" in these proceedings.

The self-liquidating improvements and utilities of the City of Philadelphia in existence at the time of the presentation of this petition consisted of: (1) The water supply system; (2) the sewer system; (3) the Frankford Elevated Railway; (4) the Bustleton sur-

face transit lines; (5) the Frankford Avenue trackless trolley line, and (6) the subway-surface extension.

Eleven proceedings have been instituted by the city under the Act of 1921, and in none of them has the question at issue been decided or raised. The practice adopted by the city in the presentation of these petitions affords no clue to the city's interpretation of this issue, for the city's practice has been varied. In two petitions filed in 1929, the city presented separately the transit indebtedness and the Delaware River Bridge indebtedness (Philadelphia v. Hadley, City Controller, 12 D. & C. 239, and Petition of the City of Philadelphia 12 D. & C. 363), although at that time there was outstanding water indebtedness and pier indebtedness which had been excluded under a court order entered in 1925. In the most recent proceeding brought under the act, however, all of the city's self-sustaining projects were included: City of Philadelphia Petition, 76 D. & C. 156 (1951).

The city advocates the "single-shot approach" and maintains that there is nothing in the act that requires a review of the status of indebtedness of all of its self-sustaining utilities each time part of the indebtedness of a single project is sought to be excluded. In advocating this interpretation of the act, however, as we have heretofore observed, counsel for the city has carefully elaborated the arguments in favor of the "basket approach" construction.

After giving full consideration to the arguments on each side, we hold that, under the Act of 1921, the city may single out for separate consideration the indebtedness of any one of its self-liquidating projects, without presenting all of them to the court for review.

The problem is one of statutory construction and lends itself to easy solution if the canons of statutory construction are kept clearly in view. Primary among these is the principle that, in interpreting a statute, all

of its parts must be given effect. Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 52, 46 PS §552. If full effect is given to all of the parts of the Act of 1921, the conclusion is inescapable that the city is authorized to single out the indebtedness of one of its self-liquidating projects for separate presentation to the court.

Section 1 of the act provides (53 PS §6757) :

"Whenever the city of Philadelphia shall have incurred or is about to incur any debt or debts for, and the proceeds thereof shall have been or are about to be invested in, any public improvements of any character, or in the construction, purchase, or condemnation of any public utility, or part thereof or facility therefor, which, *either separately or in connection with any other public improvement or public utility, or part thereof, may be expected to yield* revenue in excess of operating expenses sufficient to pay the interest and sinking-fund charges thereon, the city may, *at any time and from time to time*, present its petition to any of the courts of common pleas of the county in which such city is situated for the purpose of having determined the amount of its debt which may be deducted from its indebtedness in ascertaining the borrowing capacity of the said city . . ." (Italics supplied.)

Similar language is contained in the other sections of the statute.

Significantly, the phrase "either separately or in connection with any other public improvement or public utility, or part thereof", indicates that a self-sustaining project under the act may be either independent of all of the city's other projects or may be in combination with any of them. So long as the separate or combined revenue "may reasonably be expected to yield" the required return, the debt incurred for such purposes may be excluded. Thus, it is plain that if a project, such as the gas works, is self-sustaining in-

dependently of the city's other utilities, its indebtedness may be presented separately in a petition under the Act of 1921.

Section 4 of the act (53 PS §6760) provides that the court's order shall be "final and conclusive" "with respect to the validity of *all* municipal loans and in *all other respects*", and shall not be subject to any other appeal or review or to collateral attack of any kind whatsoever. To contend that each time the city seeks the exclusion of part of the indebtedness of a single project, it must present for review the indebtedness of all of its self-sustaining utilities is, in effect, to deny any finality or conclusiveness to orders issued under the Act of 1921. Such an interpretation would prevent the city from relying in this proceeding on the decree entered by Court of Common Pleas No. 5 on May 7, 1951, in the matter of City of Philadelphia Petition, 76 D. & C. 156.

Section 3 of the act (53 PS §6759), which prescribes the form the order shall take, provides that the court:

". . . shall make an order fixing the total amount which for that reason the said city may exclude from the calculation and deduct from its debt in ascertaining its borrowing capacity. . . . Upon the making of such order by the court or by a judge thereof, if no exceptions be filed to his decision, the amount so ascertained *shall thereupon be wholly excluded in determining the power of such city to incur debt.*" (Italics supplied.)

Giving effect to both section 3, which provides that the indebtedness shall be "wholly excluded" in calculating the city's borrowing capacity; and section 4, which provides that the order shall be "final and conclusive", there can be no doubt that in a petition under the act, the city is entitled to rely on an order entered in a prior proceeding. The act does not require that each time a new item of self-liquidating indebtedness is sought to be excluded, the city must bring before the court all of its self-sustaining projects for review.

The attempt to read a mandatory "basket approach" into the Act of 1921 is apparently inspired by a desire to prevent the city's financial officers from relying too long upon a decree that may be outmoded by changing economic circumstances, with the possibility that projects that were previously found to be self-sustaining might later fall below the standard. Whether this act or some other statute *should have been* so drafted as to provide a mandatory review of all self-sustaining projects each time a petition is filed, is not for this court to decide; that is a question for the General Assembly. The only question before us is whether or not this act *does* so provide. We are satisfied that it does not.

The "basket approach" advocates rely on what they conceive to be the fundamental concept of self-sustaining projects. Such projects, the argument runs, are placed in a special class because, producing sufficient revenues to pay for their operating expenses and debt charges, they cannot become a burden upon the general tax revenues. Therefore, there must be an obligatory review of all such projects each time a new item of self-sustaining indebtedness is sought to be excluded, just to make certain that all of the other projects are still self-sustaining. Otherwise, they might cease to be so after a decree has been entered and thus become a charge upon the general revenues. There are several fallacies in this line of reasoning.

First, the conclusion by no means follows from the premise. Granted that the indebtedness of self-sustaining utilities is exempted from the constitutional limitation on the theory that such indebtedness will not become a charge upon the taxpayers, it does not follow that the act should be so construed as to require a mandatory review of all such projects each time a petition is filed. The legislature obviously could have provided for this, if it had been deemed necessary. Instead, it provided for an initial judicial scrutiny in order to

enable the court to make its finding that a utility "may reasonably be expected to yield" necessary revenues, and found no further safeguard essential to prevent the burden of this indebtedness from falling upon the taxpayer.

Second, the standard imposed by the act is that the public improvement "may reasonably be expected to yield" revenue in excess of operating expenses and debt costs; and, even though in any given year revenues should fall below the operating and debt costs, this would not in itself constitute noncompliance with the statutory standard. Reasonable expectation is not absolute certainty; nor does one year's deficit constitute long range disaster. All revenues derived by the city from each of its self-sustaining projects, to the extent necessary to carry the particular bonded debt, must be paid into the sinking fund of the city on such bonded debt and reserved for and applied exclusively to the payment of the principal and interest of the indebtedness of the city incurred upon the particular project: Corporation for the Relief of Widows, etc., v. Philadelphia et al., 317 Pa. 76, 83 (1935).

Moreover, even apart from the act's provision that a decree entered thereunder is final and conclusive for all purposes, a loan authorization or a bond issue which depends on such an order would remain valid even though later the revenue-producing potential of the self-sustaining project slips temporarily from the statutory standard. Cf. Duane v. Philadelphia et al., 322 Pa. 33, 39 (1936), in which the Supreme Court held that the validity of a loan authorization cannot be affected by a decline in the assessed valuation base of the city's indebtedness.

Finally, the Home Rule Charter has created a new safeguard to prevent the city's self-sustaining projects from falling below the statutory standard of the Act of 1921 and becoming a burden upon the taxpayers.

Sections 5-801 and 5-901 of the charter impose upon the two executive departments charged with the operation of the city's gas, water, transit and sewer facilities the legal duty of fixing utility rates at a self-sustaining level. These two sections of the charter prescribe a basic standard for determining rates for the use of such facilities so "as to yield to the City at least an amount equal to operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred" in connection with those facilities. It must, of course, be presumed that the administrative officials charged with the legal duty of fixing rates on the basis of this standard will perform it. There is no necessity of reading into the Act of 1921 a mandatory "basket approach" provision on the pretext of preserving the self-sustaining qualities of the city's revenue-producing utilities which are already protected by the judicial review required by the act itself and by the standards set forth in the Home Rule Charter.

We therefore hold that, in a proceeding under the Act of 1921, the city may single out for separate consideration by the court any self-sustaining project part of whose indebtedness is sought to be excluded, without at the same time presenting all of its self-sustaining projects for review.