CHARLES H. MILLER, PROSECUTOR, v. TOWN OF MONT-
CLAIR AND JOHN L. COX, RESPONDENTS.

ALFRED H. HOLBROOK, PROSECUTOR, v. CITY OF EAST
ORANGE AND ANDREW MURRAY, RESPONDENTS.

CHARLES A. NUTTING, PROSECUTOR, v. BOROUGH OF
CALDWELL AND JOHN A. BRADY, RESPONDENTS.

HARRY S. MYERS, PROSECUTOR, v. BOROUGH OF ROSELLE
AND STANLEY McINTOSH, RESPONDENTS.

ERNEST R. BROWN, PROSECUTOR, v. BOROUGH OF DUN-
ELLEN AND GUSTAV WINTER, RESPONDENTS.

WILLIAM H. FISCHER, PROSECUTOR, v. TOWNSHIP OF
DOVER IN THE COUNTY OF OCEAN, AND GEORGE W.
HOLMAN, JR., RESPONDENTS.

Argued November 6 and 7, 1918—Decided February 18, 1919.

1. By reason of the Soldiers' Vote act (*Pamph. L.* 1918, *p.* 437),
   the provisions of the Local Option act (*Id., p.* 14) as to giving
   notice of a special election by posting and publication are
   rendered inoperative as constructive notice to voters in the
   national service coming within the provisions of the Soldiers'
   Vote act.
2. The Soldiers' Vote act (*Pamph. L.* 1918, *p.* 437) is not rendered
   nugatory nor does it lose its effect as a statute, because of a
   temporary impracticability of carrying out its provisions, due
   to official action of federal authorities in withholding addresses
   of men in service.
3. A failure to carry out the requirements of the Soldiers' Vote
   act (*Pamph. L.* 1918, *p.* 437) whereby a substantial percentage
   of voters lose the opportunity to vote, is more than a mere
   irregularity in conduct of an election, it is a practical dis-
   franchisement of such voters.
4. Where the Soldiers' Vote act (*Pamph. L.* 1918, *p.* 437) required
   the secretary of state to mail voting papers to each voter in
   service at least twenty days before any general or special
   election, and he was unable to do so because of the failure of

local authorities to notify him in time, that such special election was to be held, it cannot be said that there was a reasonable attempt to comply with the provisions of the act.

5. The statutory review of local option elections under *Pamph. L.* 1918, *p.* 14, is not an election contest to determine which party was successful but a review of the legality of the entire election, to determine whether it was held according to law.

6. The Soldiers' Vote act (*Pamph. L.* 1918, *p.* 437) is not unconstitutional as providing a different method of counting the soldier vote from that provided in constitution, article 2, paragraph 1.

Before Justices PARKER and MINTURN.

For the prosecutors, *George S. Hobart* and *Benjamin F. Jones.*

For the defendants John L. Cox and John A. Brady, *Harrison P. Lindabury.*

For the defendant Andrew Murray, *James R. Nugent.*

For the defendants Stanley McIntosh and Gustav Winter, *Abe J. David* and *Samuel Koestler.*

For the defendant George W. Holman, Jr., *Wilfred H. Jayne, Jr.*

The opinion of the court was delivered by

PARKER, J. These writs bring before this court for review the several determinations of three justices of this court, each sitting as a special legislative tribunal, pursuant to sections 25 and 26 of the Local Option act (*Pamph. L.* 1918, *pp.* 32, 33), setting aside special elections held under said act in the town of Montclair, the city of East Orange and the borough of Caldwell, in Essex county; the boroughs of Roselle and Dunellen, in Union county, and the township of Dover, in Ocean county. In each of the cases the election was set aside because the justice held that proper opportunity was not afforded as required by law for the casting of the vote of soldiers and sailors absent in government service, as pro-

vided in chapter 150 of the laws of 1918 (*Pamph. L., p.* 437), and that sufficient of such votes were missing to have changed the result. We are asked to reverse those decisions and declare the elections valid on several grounds. All five cases were argued together, and for the most part are susceptible of consideration as one case.

The first general ground of reversal urged is that the absentees were afforded an opportunity to vote at the special elections—first, because legal notice of each of such elections was given, and this charged them with notice that it was to be held, and secondly, that having such constructive notice, they were entitled, under chapter 150, to prepare and forward unofficial ballots.

This argument rests on the claim, supported by the evidence, that the public notice of special election required by the Local Option act was duly given; and it may well be conceded that as to absentees generally who receive no notice in fact, the statutory notice is binding. As to the voters in the military and naval service the case is different. Apart from the constitutional proviso (article 2, paragraph 1) which it is argued, applies only to elections for officers and not to referendums chapter 150, which may be called the Soldier Vote act, declares a legislative intent to procure the military absentee vote for special elections *eo nomine,* and provides how it is to be procured. And in our estimation it evinces a clear intent to disregard the doctrine of constructive notice, at least so far forth as respects the Local Option act, and to apply a rule of actual notice by mail or messenger if within reasonable limits of possibility. Instead of advertisement set up and published at least fifteen days before the election, as in the Local Option act, we find that a list of names and addresses of men in military service is to be made up, and at least *twenty* days before the election, blank or printed ballots are to be mailed to the voters, by the secretary of state (section 4), and a list of candidates, when there are candidates to be voted for, is to be forwarded in a similar manner by the municipal clerk or the secretary of state "as soon as possible" "by mail or otherwise." Two things are plain: The fifteen-

day notice is not taken into account as sufficient in time for these absentees, and each one is to be notified, if possible, personally or by mail and to receive information sufficient, independently of all advertisement, to enable him to prepare his ballot. Nay, more: The absentee is not even charged with notice of the act itself to the same extent as a civilian; for he is entitled to receive from the secretary of state, with his ballot, either a printed copy of the act or printed directions how to prepare and transmit the ballot. (Section 6, page 439.) Under these circumstances, we think the argument of constructive notice of a special election is without force, and, of course, if there were no constructive notice, actual notice cannot be presumed, and, if none, the right to cast an unofficial ballot is an empty form, in no way meeting the requirement of section 14 that the act "shall be liberally construed for the purpose of affording an opportunity to persons in active service  *  *  *  to vote at any primary, general or special election."

The next point is, that under the conditions as they developed, it was impossible to comply with the requirements of the Soldier Vote act. It is made plain that for military reasons information with respect to men overseas was refused by the national government. From this it is argued that because of the temporary impracticability of compliance with the requirements of the Soldier Vote act, those requirements may, so far as the impracticability extends, be ignored, rather than that the special election should wait until they can be complied with. We cannot take this view. The legislature said, on January 30th, "you may have special elections for local option by taking certain procedure." February 28th it modified that and said: "Soldiers and sailors are to have the right to vote at all primary, general and special elections, and are, with respect thereto, to be communicated with and their ballots taken in the manner now laid down." It did not say that if the war department should refuse to aid, any other course might be pursued or the act disregarded. It is said that the law does not require impossibilities, but the temporary condition existing should not be classed as an impossi-

bility.  Our conclusion on this point is that the requirements of the Soldier Vote act controlled, and it was necessary, substantially, to comply with them.

The next point is, that this failure of compliance was only an irregularity which should not invalidate an otherwise full and fair election, particularly in the absence of evidence that the absentees would have voted against local prohibition.

We cannot concede that it was a mere irregularity.  It was failure to carry out the law whereby a substantial percentage of voters must be held to have lost the opportunity to register their will.  The rule urged as to burden of proof, that it should appear and does not, that the absentees would have voted "wet," is one perhaps applicable to a contest between opposing candidates at a valid election, but not, as we view it, to an inquiry such as we are now reviewing.  Under the statute (*Pamph. L.* 1918, *p.* 32, § 25) the attack is not on the result but on "the validity of the election."  Such is the statutory language, and this is plain, from the fact that the matters now attacked are judicial declarations that the elections were void and orders setting them aside.  In such an inquiry, the rule contended for, we think, does not apply.  *Allison* v. *Blake,* 57 *N. J. L.* 6.

The next point is, that "qualified electors who are absent in the military service have no constitutional right to vote for (*sic*) such a proposition as was submitted at the several elections."  This may be conceded for present purposes.  The respondents properly rely on the statute (chapter 150 of the laws of 1918), whose intent as respects soldier votes is clear, and which is at present the law.  We think no further basis of the right need be discussed.

Point 5 is, that the right of soldiers and sailors to vote was subject to and superseded by federal regulations.

We see no reason why such regulations should be viewed as superseding the Soldier Vote act alone, without any corresponding effect on the Local Option act as well.  The same argument in another form has already been discussed.  Our answer, again, is, that the Soldier Vote act became part of the

machinery of the Local Option act, and if federal interference cut off the soldier vote, it left the Local Option act without the means of taking effect through referendum so long as the soldier vote remained so cut off and the Soldier Vote act remained in force.

Point 6 relates to the Montclair and East Orange cases only, and challenges the finding of fact by the Chief Justice, who sat in those cases, that the Soldier Vote act was not complied with, nor was every reasonable effort made to comply with it, as he held it should be. The challenge cannot be sustained. In the Montclair case the council passed a resolution, on March 14th, for an election to be held April 30th, nearly seven weeks later. No notice of this was sent to the secretary of state till April 18th, reaching him on the 19th, so that it was impossible for him to do any of the things required of him at least twenty days before the election. (Sections 4 and 5.) The town clerk sent out no communication to the voters in service at any time. The secretary of state did send out ballots on April 22d and 23d to the number of three hundred and sixty-four. He did, probably, as well as he could, but was hopelessly late through no fault of his own. There were about eight hundred men in service, and say seventy per cent. of them voters; the stipulation of facts says sixty to eighty per cent.; probably, five hundred. The campaign committee also wrote to voters in service; sixty-four ballots were received, of which thirty-one had to be rejected. The majority for prohibition, with about four hundred and fifty potential votes outstanding, was nineteen. How it can be said that all reasonable effort was made to get in these votes, when no one moved for five weeks after the election was ordered, we are at a loss to understand.

In the East Orange case the argument proceeds upon what we conceive to be the false assumption, as already noted, that the contest is over the number of votes *pro* and *con* rather than over the validity of the election. It appears that there were about one thousand men in the service; only five hundred ballots were printed, and these mailed on April 30th, seven days before the election. Proof is lacking as to how many of

the one thousand were qualified voters, but it is hardly conceivable that in view of the rules of enlistment and draft there were not many more than the one hundred and fourteen whose ballots were received and counted, and ninety whose ballots were rejected as not prepared in time. As in the Montclair case, the municipal clerk did not move in time to have the ballots sent out at least twenty days before the election. At least, they could have been ready, and, if so, a question might arise as to the inability of the secretary of state to procure the proper addresses, which, under the circumstances, seems to be not before us. We consider that the finding by the Chief Justice was supported by the evidence.

Point 7 relates to the Dunellen case, and is, that the number of absent voters not actually notified of the election was insufficient to change the result.

The election was ordered on April 19th to be held June 11th. The majority was fifty-one, three less than the fifty-four absent electors. Of these, seven were overseas, and what we have said above relating to the federal inhibition applies to them. As to the others, it is stipulated that the regular issues of the local paper of May 25th, May 30th and June 6th, containing advertisements of the election, were duly mailed to thirty of them in regular course. Hence, it is argued that these thirty received actual or constructive notice of the election in time to prepare and forward unofficial ballots, though no ballot was sent to any of the fifty-four by the secretary of state, or the municipal clerk; no copy of the Soldier Vote act, and no printed directions how to prepare ballots as therein required. There was no constructive notice, because, as we have said, the Soldier Vote act makes that rule inapplicable. As to actual notice, if it be said the presumption of due receipt of a letter mailed in peace time is to apply to fourth-class mail in war time and during a confusion in the mail service, which is matter of common knowledge, it does not follow that the recipients read the papers through and saw the notices of election printed therein. It strains the doctrine of presumption to the breaking point to charge actual notice on the soldier because there was mailed

to him a folded newspaper containing such notice in its columns with nothing to call attention to it. Moreover, if he should see it, yet he had no knowledge how to prepare and send in his unofficial ballot. No official ballots were sent, either printed or blank; no copies of the act, and no instructions. In lieu of this, prosecutors rely on the weekly paper from home. We think their reliance is misplaced.

8. Lastly, and as an additional reason filed, after the others, it is said the Soldier Voting act is unconstitutional, because it requires the secretary of state, on receiving the returned ballots from voters, to transmit them for counting to the county board of elections instead of the local board. The constitutional language is: "The legislature shall have power to provide \* \* \* for the return and canvass of their votes in the election districts in which they respectively reside." *Const., art.* 2, ¶ 1. We have no particular difficulty with this language. It does not say that the votes are to be counted by the local election boards. What the constitution aims at is the counting of each vote so that it appear on the return in the district where it belongs; the method of securing this result is left to the legislature, which, in the present case, has said that the county board shall open and count the votes. No particular place is specified for this in the act, and if the constitution means that actual counting should be done in the election district, the county board may attend there for that purpose. We do not think it appears whether they did so or not; and, at all events, the only point made is that the act violates the constitution. We are clear that it does not. There is no question that such votes as were received and counted appeared on the returns of the proper districts.

We find no adequate reason for setting aside the findings of the Supreme Court justices in any of the cases, and the several writs will therefore be dismissed.