## Absentee Ballots Case (No. 1).

Argued May 20, 1968. Before BELL, C. J., MUS-
MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Richard S. Campagna,* with him *Donald B. Cahoon,
Jr.* and *Huette F. Dowling,* for appellants.

*David Berger,* with him *Howard L. Schambelan,
Paul A. McGlone* and *Hugh J. McMenamin,* for ap-
pellee.

OPINION BY MR. JUSTICE MUSMANNO, September 4, 1968:

On November 7, 1967, a general election was held in Lackawanna County for county commissioners, the two Republican candidates being Charles R. Harte and Samuel C. Cali, and the Democratic candidates being Edward Zipay and Patrick Mellody. Following the casting of votes, the voting machine tabulations registered the following tally:

| | | |
|---|---|---|
| Zipay | — Democrat | — 46,435 |
| Harte | — Republican | — 46,194 |
| Cali | — Republican | — 46,154 |
| Mellody | — Democrat | — 45,022 |

According to this score, if there were no other votes to be counted, Zipay, Harte and Cali would have been elected because, in providing for minority representation on the board of commissioners, the law declares that the three candidates receiving the highest number of votes shall constitute the board of commissioners. However, the computation recorded above did not tell the whole story. There were absentee votes yet to be counted, 6,080 of them. 574 ballots were sent in by military personnel and by war veterans; 5506 were mailed in by civilians who were, under the election code, entitled to vote by mail because of inability to get to the polls. When these absentee votes were counted and added to the voting machine totals, the election picture changed. The new lineup showed the winning candidates to be Zipay, Mellody and Harte.

However, before the actual tallying of the absentee ballots, the candidates Harte and Cali, anticipating or fearing that the tide of absentee votes would wash out their margin of victory, went before Lackawanna County's board of elections and objected to the counting of the absentee ballots, claiming that absentee voting was unconstitutional. After various procedural

steps unnecessary to relate here, the county board of elections ruled against Harte and Cali. This ruling was confirmed by the court of common pleas, and Zipay and Harte filed a petition for review by this Court under Supreme Court Rule 68½,[1] which was granted.

It is the contention of Harte and Cali, appellants, that the county board of elections had no constitutional authority to canvass the absentee votes. Article VIII, §19, of the Constitution (Amendment of 1957) (now Article VII, §14), states: "The Legislature shall, by general law, provide a manner in which, and the time and place at which, qualified electors who may, on the occurrence of any election, be absent from the State or county of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability, may vote, and for the return and canvass of their votes in the election district in which they respectively reside."

The Act of August 13, 1963, P. L. 707, 25 P.S. §3146.8, provides that the county board of elections shall canvass all absentee ballots received in any particular county.

The appellants maintain that this statute is unconstitutional because "it provides a procedure for the return and canvass of absentee ballots on a county-wide basis by the County Board of Election whereas,

---

[1] The county commissioners normally serve as a county board of elections, but since in 1967 the commissioners were themselves candidates for reelection, the court of common pleas sat, in accordance with law, in that capacity, this doubling in brass in no way affecting their constitutional prerogatives as judges of courts of common pleas, who later passed on their own rulings when they sat as the board of elections.

Article VIII, Para. 19, provides for the return and canvass of their (absentee) votes in the election district in which they respectively reside."

It is an elementary principle of statutory construction, which this Court has affirmed on numerous occasions, that "An act may not be declared unconstitutional unless it violates the Constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation in our minds." *Land Holding Corp. v. Board of F. and R.*, 388 Pa. 61, 72.

In considering whether a statute offends against the Constitution, the courts look at it through historical as well as analytical eyes. "Where a statute has been in force for many years without any question as to its constitutionality being raised and engagements have been entered into on the strength of its validity, the court will not undertake the drastic measure of wiping it off the statute books unless it is convinced beyond all peradventure of doubt that it violates a provision of the fundamental law." *Wilson v. Philadelphia School District*, 328 Pa. 225, 242 (1937).

The history of the canvass of absentee ballots reveals that at no time prior to this litigation (and companion litigation in York County, a decision on which case is also being handed down today)[2] did anyone question the authority of the county board of elections to do what the Lackawanna County Board of Elections did here. In 1937 the election code provided that the machinery of administering absentee soldiers' votes was to be operated by the county board of elections, which was also to count and record those votes. (Act of June 3, 1937, P. L. 1333, §§1329-30.)

In 1957, as above cited, the Constitution was amended to extend voting privileges to civilians as well as military personnel and disabled war veterans. Be-

---

[2] *Absentee Ballots Case (No. 2)*, 431 Pa. 178.

tween 1937 and 1963 the election code was amended frequently, and in each instance, where this subject was involved, the code provided that absentee ballots were to be canvassed by the county board of elections.

During all this time, county commissioners, legislators, mayors, and other governmental officials have been elected (partly through absentee votes), they have served out their terms of office, they have enacted laws, supervised the expenditure of public moneys, administered complicated governmental enterprises, all of which form an integral part of the fabric and business of the Commonwealth of Pennsylvania. To say today that many of these officials were illegally elected and that everything they have done has no constitutional sanction, would be to shake the very structure of our State government. However, it is not for that reason that we would declare constitutional the provisions of the election code here under fire. If something is demonstrated to be monumentally wrong it becomes the duty of the courts to so declare, regardless of current embarrassment and discomfort, all to the end that what is wrong may be made right and illegal wounds inflicted may be cured as quickly as possible, whatever may be the surgery and legislative therapy required. We refer to the hitherto freedom from attack of the election code (on the subject of county canvassing of absentee ballots), only for the purpose of showing that the absence of constitutional condemnation would suggest that the lawmakers of the state are satisfied it conforms to the Constitution. Otherwise, it would be reasonable to suppose that, considering the number of times the Legislature has had opportunity to review the code, if the county canvassing of absentee ballots were as flagrant a violation of the Constitution as the appellants contend, the Legislature would have noted this, and made the demanding correction.

Absentee voting is a salutary feature in our democratic processes of government. It assures the exercise of the most sacred privilege of citizenship, namely, a participation in the selection of those who are to guide the destiny of community, state and nation, even though illness or pressing business might make it impossible for the elector to appear at the voting poll in his district on election day. The appellants themselves recognized the importance of absentee balloting by having solicited the votes of those they had reason to believe could not be in their election districts on election day. It is stated in the appellee's brief, and not questioned in the appellant's brief, that "appellants-candidates Harte and Cali were elected at the primary elections partially on the strength of absentee ballots solicited by them."

For the appellants to argue for the unconstitutionality of absentee voting, could be to argue against their own nominations. In addition, it must be noted that the paramount rights of the voters must be considered. The appellants do not deny the validity of the 574 military ballots, but they would nullify the votes of 5,506 civilians. Such mass disfranchisement should not be proclaimed except for grave constitutional infirmities, certainly not present here. In *Perles v. Northumberland Co. Return Board,* 415 Pa. 154, 158, where absentee voting was involved, Justice JONES, speaking for the Court, said: "The disfranchisement of even one person validly exercising his right to vote is an extremely serious matter. If, assuming, arguendo, *some* but not all of the ballots were invalid, and we should declare *all* the absentee ballots void because of the few that might be invalid, we would be disfranchising a large number of voters whose votes have not been shown to be invalid."

Here it is not a matter of disfranchising one person, but 5,506 persons because of ballots which no one claims were illegally marked, cast or counted. The disfranchisement of 5,506 citizens for following a procedure laid down by the election authorities would be unconscionable, since the appellants do not contend that they were the victims of fraud, or even mistake. The challenges to absentee ballots were heard by a commission of four able, respected lawyers of Lackawanna County (two from each major political party), appointed by the judges of Lackawanna County. The appellants do not suggest that they were harmed in any way by this bi-partisan, impartial, competent commission. Indeed, the appellants entered into a stipulation, two paragraphs from which indicate the tenor of the acknowledgment that an honest count was made: "The parties hereto specifically agree to withdraw all challenges on any ballots of electors of the City of Scranton and City of Carbondale noted on the face of said mailed ballot envelopes and expressly waive their right to assert hereafter in these proceedings any objection or re-challenge thereto, except for challenged ballots on which hearings have been held or which are held by the Board for future determination, or the general constitutional challenge provided for in paragraph 2, above.

"Notwithstanding any provisions of the election code of Pennsylvania and, specifically, the provision of Section 24, of the Act of August 13, 1963, P. L. 707 (25 P.S. 3146.8) defining the time at which unchallenged ballots shall be counted (which the parties hereto regard as procedural, and not affecting the substantive rights of electors or parties hereto), the parties hereto agree that the Board shall proceed immediately to count and record all unchallenged ballots, District by District, of the City of Scranton and City

of Carbondale, and that such count and recordation shall continue uninterrupted, all parties hereto agree to waive their right to object or appeal because of any departure from the provisions of the election code as provided for in this paragraph."

The only question raised by the appellants is not *how* the votes were counted, but *where* they were counted. It is not contended that if the votes had been counted by the district election boards instead of the county board, the results would have been different. It would therefore be a stultification of reason and justice, as well as a jettisoning of common sense, to throw out 5,506 votes because, in effect, the counters of the votes sat in a brick and stone courthouse instead of a garage, schoolhouse, or empty building as they counted ballots. Certainly this is not sound reason for invalidating votes, free from any semblance of taint.

In *Norwood Election Contest Case,* 382 Pa. 547, 549, this Court said, "The right of suffrage is the most treasured prerogative of citizenship. Whether the right be exercised in the choice of President of the United States or a borough councilman, it may not be impaired or infringed upon in any way except through the fault of the voter himself. . . . Every rationalization within the realm of common sense should aim at saving the ballot rather than voiding it."

In *Bauman Election Contest Case,* 351 Pa. 451, 454, Chief Justice MAXEY said: "The power to throw out a ballot for minor irregularities, like the power to throw out the entire poll of an election district for irregularities, must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disenfranchised at an election except for compelling reasons." Those compelling reasons are not apparent here, especially when we keep

in mind the fundamental proposition that in weighing the constitutionality of a statute "all presumptions are in favor of the constitutionality of acts." (*Sablosky v. Messner,* 372 Pa. 47.)

As we study the objective realities of county-wide canvassing of votes, we are led inevitably to the conclusion that the framers of the controverted constitutional amendment never intended that the actual counting of the absentee ballots was to be performed in the local districts as against the more-convenient, expeditious, business-like operation of having them tabulated on a county-wide basis. The appellants argue that the counting of absentee votes should be accomplished in the election districts because the members of the district boards are in a better position to personally know the electors than the county commissioners are. But here it is not a matter of knowing the electors; it is a question of determining whether the absentee electors had a legitimate excuse for voting by mail and this, in the event the vote is contested, can only be determined by questioning persons who know the reasons for the elector's absence from the voting poll on election day. This could involve the testimony of strangers to the district as, for instance, the testimony of people living in the town or place, away from home, where the elector claimed he had to be for business reasons. The impracticality of the plan argued for by the appellants is also very apparent because in its inevitable unfoldment, it would require a multiplicity of tribunals throughout the county, instead of the centralized one in the county board of elections.

Lackawanna County has 243 election districts. The appellants would require hearings in each of these districts, assuming absentee voters lived in these districts. Since hearing on contested absentee ballots frequently require, or at least recommend, the services of attor-

neys in upholding a candidate's claim to certain absentee ballots, this could mean the candidate would have to employ scores of attorneys. The appellants themselves recognized this difficulty in their appearance before the lower court. The court below, in its able opinion, said on this point: "From a practical standpoint, it must be considered that to follow the reasoning of the appellants would require, in Lackawanna County, the distribution of absentee ballots to some 243 election districts. It would then require special arrangements for the opening, challenging, counting, and tabulating of these ballots in each of these 243 separate places. This in itself would create chaotic and highly disruptive situations.

"In their own arguments, before this Court, counsel for the appellants strenuously objected to opening or holding hearings on challenged ballots in more than *one place* (court had suggested *two*). They claimed no candidate could properly be protected unless it was all done in one place, at one time. To attempt to conduct such a canvass in 243 different places throughout the county would be to invite all types of improprieties and errors."

In *Duane v. Philadelphia*, 322 Pa. 33, 44, this Court said: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression or an absurd consequence."

To require hearings in 243 separate places when the job can more effectively be done in one, could only lead to absurd consequences.

It is a matter of gratification that in taking up the matter of construing the constitutional provision here involved, we are aided by a decision in the neighboring sovereign state of New Jersey, which has in its Constitution a provision exactly similar to the one here

under discussion. That Constitution provides that the New Jersey Legislature has the power to provide "for the return and canvass of their votes in the election districts in which they respectively reside."

In the case of *Miller v. Town of Montclair*, 92 N.J. Law 292, 108 A. 131, it was argued, as here, that the absentee ballots had to be canvassed in the local election districts instead of at the county seat. The Supreme Court of New Jersey found this argument untenable, stating: "We have no particular difficulty with this language. It does not say that the votes are to be counted by the local election boards. What the Constitution aims at is the counting of each vote so that it appears on the return in the district where it belongs; the method of securing this result is left to the Legislature, which, in the present case, has said that the county board shall open and count the votes. No particular place is specified for this in the act, and, if the Constitution means an actual counting shall be done in the election district, the county board may attend there for that purpose. We do not think that it appears whether they did so or not; and, at all events, the only point made is that the act violates the Constitution. We are clear that it does not. There is no question that such votes as were received and counted appeared on the returns of the proper districts."

The reasoning of the Supreme Court of New Jersey is obviously sound and salutary, namely, that what the Constitution aims at is the counting of each vote not *by* the local elections district but in such a manner that the computation appears on the return *in* the district where it belongs. That is what was done in the case at bar. The county board of elections tallied the absentee votes and applied the tallies to the districts in which the absentee voters respectively resided.

We, therefore, find that the Act of August 13, 1963, P. L. 707, 25 P.S. §3146.1-3146.9 is constitutional.

But one other matter needs to be considered. When this case was argued before the Court of Common Pleas of Lackawanna County on December 22, 1967, the appellant announced for the first time that the election code establishing county commissioners as election officers for the purpose of canvassing votes was unconstitutional, because Article VIII, §15, of the Constitution (now Article VII, §12) disqualifies the commissioners from acting as district election officers. This matter was not argued before the county election board, and there could be some question as to whether it can be raised on appeal.

However, be that as it may, the county commissioners, when they canvass election returns, are not sitting as district election officers but as the return board of their county. In addition, the return board in this particular case was made up of the court of common pleas sitting as a county board of elections, and, in that capacity, the court appointed a board, as already stated (made up of two Republican and two Democratic attorneys), to hear all testimony on the subject of the validity of absentee ballots. Moreover, to say that the common pleas judges sitting as the county election board are "election officers" and thus disqualified to act because of Article VIII, §15 of the Constitution, would mean that the entire election in Lackawanna County, indeed of all Pennsylvania, would be declared illegal, a result so absurd as to need no further comment. In addition, it must be obvious that the Constitutional provision in question outlining qualifications for election officers refers to Article VIII, §14, entitled "Election Officers" and defines the same as "a judge and two inspectors" who comprise district election boards. Thus, Article VIII, §15 was intended

to regulate the qualifications of the persons supervising the polling places on election day, and not the county board of elections, operating *after* election day.

The order of the court below is affirmed.

Mr. Justice JONES and Mr. Justice ROBERTS concur in the result.

Mr. Justice COHEN took no part in the consideration or decision of this case.